UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FARZAMA A. MIKRAZI,

                         Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner
of the Social Security Administration,

                         Defendant.

_____

**DECISION AND ORDER**

15-CV-698

## INTRODUCTION

The parties have consented to my jurisdiction in this case pursuant to 28 U.S.C. §636(c). [14].[1] This is an action brought pursuant to 42 U.S.C. §405(g) to review the final determination of the defendant Acting Commissioner of Social Security that plaintiff was not entitled to Social Security Supplemental Security Income ("SSI") benefits. Before me are the parties' cross-motions for judgement on the pleadings [8, 12].

For the reasons stated below, this case is remanded to the Acting Commissioner for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed an application for SSI on February 3, 2012[2] (T. 128 of 564). Her initial application was denied, and an administrative hearing was subsequently held before Administrative Law Judge ("ALJ") Timothy McGuan on August 23, 2013 (T. 40 of 564). On January 16, 2014, ALJ McGuan determined that plaintiff was not disabled (T. 16 of 564). The Appeals Council denied

---

[1]   Bracketed references are to the CM/ECF docket entries.

[2]   Plaintiff actually submitted her application on March 1, 2012 (T. 128 of 564), however the parties agree that her protective filing date is February 3, 2012. Plaintiff's Memorandum of Law [8-1], p. 1; Acting Commissioner's Memorandum of Law [12-1], p. 1.

plaintiff's request for review on June 10, 2015, making the ALJ's determination the final decision of the

Acting Commissioner (T.1-3 of 564).  Plaintiff thereafter commenced this action.


## BACKGROUND

Plaintiff was born in 1970 (T. 128 of 564) and came to the United States from Iran in

1998 (T. 44 of 564).[3] She has a high school diploma. Id. Her husband moved backed to Iran and his

return is uncertain (T. 48 of 564).  She lives with her two daughters, aged 20 and 14 at the date of the

hearing. Id. Her daughters help her with cleaning, laundry and taking out the garbage (T. 58 of 564).

Plaintiff does the cooking (id.), and states that she also cleans the house (T. 52 of 564).

She asserts that she became disabled on January 1, 1996 (T. 128 of 564) due to

depression, mental problems, panic attacks and thyroid problems (T. 149 of 564). During the hearing,

plaintiff's counsel noted that plaintiff may require surgery on her foot due to a heel spur and plantar

fasciitis (T. 39 of 564).  Plaintiff's work history included short-term jobs as a cashier in a retail store,

babysitting for a friend, and as a packer (T. 150 of 564).

Plaintiff's thyroid impairment is controlled with medication (T. 42 of 564). She also has a

reflux condition that is controlled by medication (T. 50 of 564). Her back has mild degenerative changes

and "some arthritis", however, plaintiff does not claim that this is a chronic condition (T. 51 of 564).

Plaintiff claims that she is disabled primarily due to her psychological problems. Plaintiff

testified that she cannot work because she is "scared to go out" and has panic attacks (T. 41 of 564).

The medical reports in the record cover the period from March 2011 through August 2013. In a report

dated March 17, 2011, Dr. Sukhwinder Kodial, plaintiff's treating internist, lists "generalized anxiety

---

[3]   References denoted as "T" are to the transcript of the administrative record. The page references are to numbers on the top
of the page, not the bottom.

disorder" among plaintiff's "chronic problems" (T. 266 of 564). However, the record does not indicate

what treatment plaintiff received for anxiety or depression prior to 2011.[4]

With respect to her psychological conditions, plaintiff has been treated by Nurse

Practitioner Isabel Molina (T. 2867 of 564) and mental health counselor Patricia Jankowski, LMSW (T.

553 of 564) at Horizon Health Services. In a report dated March 31, 2011, NP Molina noted a "slight

improvement" in plaintiff's mood, but stated that she was fixated and "perhaps paranoid" about her

husband. (T. 288 of 564).[5]

On May 5, 2011, NP Molina noted a "significant improvement" in plaintiff's mood due

to a recent adjustment in her medication (T. 287 of 564). It was noted that plaintiff's "sleep has

improved, less paranoid, less labile". Id.  On June 9, 2011, NP Molina stated that plaintiff's "mood is

calm and pleasant" and noted that plaintiff stated "I am calmer" (T. 286 of 564). She also noted that

plaintiff's sleep had improved and that she was going to visit family in Iran for two months. Id.

A report dated November 25, 2011, states that plaintiff's symptoms include

"experiencing anxious, fearful thoughts, compulsive thoughts or behaviors, depressed mood, diminished

interest or pleasure, fatigue or loss of energy, poor concentration, indecisiveness, restlessness or

sluggishness and sleep disturbance (T. 253 of 564). NP Vasquez noted that, at that time, plaintiff was

"stable on Prozac, Trileptal and Ambien at night". Id.

Plaintiff's depression and anxiety appeared to increase in early 2012. In a report dated

February 20, 2012, NP Molina stated that plaintiff was restless, anxious and had some paranoid

ideations (T. 283 of 564). Her sleep had also deteriorated. Id. NP Molina found that plaintiff's mood was

---

[4]   On November 25, 2011, Elizabeth Vaszuez, a Nurse Practitioner in Dr. Kodial's office, stated that plaintiff's "initial visit" for depression was April 30, 2010 (T. 253 of 564), but does not otherwise discuss what treatment was previously provided.

[5]   The notation regarding plaintiff's "slight improvement" suggests that plaintiff had received prior treatment at Horizon Health Services relating to her psychological conditions. Reports relating to any prior treatment are not in the record.

"disturbed, anxious" her affect was "slightly paranoid" and her speech was "pressured [with] racy

thoughts" (T. 284 of 564). She also noted that plaintiff appeared with "excessive/inappropriate makeup

and attire" (T. 283 of 564).

On March 19, 2012, plaintiff was found to be calmer but still depressed and tearful (T.

488 of 564). She was mourning the death of her mother. Id. Her anxiety had increased and she

experienced panic attacks and thoughts of hurting herself. Id.   NP Molina increased the dosage of

Trileptal, Prozac and Ambien (T. 489 of 564).

On April 19, 2012, plaintiff completed a questionnaire stating that nearly every day in the

past two weeks she was bothered by "feelings of depression or hopelessness", "trouble falling or staying

asleep", "feeling tired or having little energy", "poor appetite or overeating", and "feeling bad about

yourself – or that you are a failure or have let yourself or your family down" (T. 395 of 564). On several

days during the prior two weeks plaintiff reported that she had "trouble concentrating on things, such as

reading the newspaper or watching television" and "moving or speaking so slowly that other people

could have noticed . . . [or] being so fidgety or restless that you have been moving around a lot more

than usual". Id.

On April 30, 2012, plaintiff underwent a consultative psychiatric examination by Dr.

Susan Santarpia (T. 289 of 564). Upon examination, Dr. Santarpia found that plaintiff's affect was

dysphoric[6] and her mood was dysthymic[7] (T. 290 of 564). She determined that plaintiff's attention and

concentration were mildly impaired due to anxiety. Id.  Dr. Santarpia opined that plaintiff's recent and

---

[6]   According to Stedman's Medical Dictionary (27th Edition. 2000), dysphoria is defined as a "mood of general
dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort".

[7]   According to Stedman's Medical Dictionary (27th Edition. 2000), dysthymia is "a chronic mood disorder manifested as
depression for most of the day,  more days than not, accompanied by some of the following symptoms: poor appetite or
overeating, insomnia or hypertension, low energy or fatigue, low self-esteem, poor concentration, difficulty making
decisions, and feelings of hopelessness".

remote memory were impaired due to nervousness (T. 291 of 564). She also found that plaintiff's

cognitive functioning was estimated to be in the low average range. Id.

Nevertheless, Dr. Santarpia stated that plaintiff could follow simple directions, perform

simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, and

appropriately deal with stress within normal limits. Id.  Dr. Santarpia, concluded, however, that that the

"results of the present evaluation appear to be consistent with psychiatric problems and may acutely

interfere with the claimant's ability to function on a daily basis". Id.

On May 24, 2012, plaintiff was found to be tense and restless, and reported having

explosive outbursts at home (T. 491 of 564). Her sleep was poor and her anxiety had increased. Id.  NP

Molina discontinued Trileptal, started plaintiff on Depakote, and again increased her dosage of Prozac

(T. 492 of 564).

By June 14, 2012, plaintiff reported "significant improvement" since the change in her

medication (T.  493 of 564), but stated that she still suffered from sleep disruption and was anxious

about leaving the house alone. Id.  A report dated July 26, 2012 states that plaintiff was "not very

depressed" (T. 495 of 564).

The record reflects that plaintiff's symptoms again worsened. On October 15, 2012, she

reported that she "continues to feel anxious daily, with panic attacks" (T. 497 of 564). She also reported

"continued [obsessive compulsive disorder] behaviors of obsessively cleaning". Id. It was noted that

plaintiff would be traveling to Iran to visit her brother who had become ill. Id. In this report, Ms.

Jankowski asked NP Molina if plaintiff's case could remain open during her absence because when

plaintiff went to Iran the previous year to care for her dying mother she returned "very decompensated"

and it took "months to stabilize". Id. Plaintiff was reported to be bipolar. Id.[8]

---

[8]    Dr. Kodial repeated plaintiff's bipolar disorder diagnosis on October 23, 2012 (T. 426 of 564).

On October 18, 2012, NP Molina reported that plaintiff was worried and tense, but not psychotic (T. 498 of 564). Her sleep had deteriorated. Id. Plaintiff complained that she was overwhelmed and that she was getting headaches. Id. NP Molina stated that plaintiff appeared to have increased anxiety and urged her to maintain her regimen of medication during her travels and to continue treatment as soon as she returned home (T. 499 of 564).

Plaintiff was seen at the Millard Fillmore Suburban Hospital emergency room on January 18, 2013 due to pain in the area of her left Achilles tendon and ankle (T. 444 of 564). She was diagnosed with tendinitis (T. 446 of 564). On January 22, 2013, she was examined by Dr. Kodial, who noted that an x-ray of plaintiff's ankle revealed swelling of her lateral malleolus[9] and that she was using an ankle brace (T. 432 of 564). He also noted mild local pain upon palpation (T. 433 of 564).

Plaintiff was examined by Dr. Jennifer Teeter at the Buffalo Orthopaedic Group on January 28, 2013 (T. 454 of 564). At that time, plaintiff reported severe difficulty ambulating. Id.  Dr. Teeter observed that plaintiff walked with a left antalgic gait,[10] and that there was discomfort with palpation over the lumbosacral spine. Id. Radiographic imaging revealed a small plantar calcaneal spur (T. 455 of 564). Dr. Teeter's impression was that plaintiff had diffuse left ankle pain and possible lumbar radiculopathy. Id.

On that same date, plaintiff was evaluated for physical therapy by Daniel Brown, DPT (T. 451 of 564). Plaintiff reported constant left heel pain. Id. Dr. Brown stated that plaintiff presented with "signs of plantar fasciitis versus possible left lumbar radiculopathy". Id.  He noted that plaintiff ambulated "with a major limp with no left heel strike or push-off". Id.  It was ordered that she receive physical therapy once or twice a week for four to eight weeks. Id.

---

[9]    According to Stedman's Medical Dictionary (27th Edition. 2000), a malleolus is a rounded bony prominence such as those on either side of an ankle joint.

[10]   According to Stedman's Medical Dictionary (27th Edition. 2000) , antalgic is a synonym for analgesic which refers to something characterized by a reduced response to a painful stimuli.

A report dated February 4, 2013 reflects the results of an MRI which revealed mild to moderate plantar fasciitis, calcaneal spur, and mild insertional Achilles tendinosis (T. 457 of 564). Dr. Teeter discussed the possibility that plaintiff's pain was the result of low back radiculopathy in addition to an ankle pathology. Id.

Plaintiff was examined by Dr. David Perelstein, a Podiatrist, on February 28, 2013 (T. 463 of 564). He reported that plaintiff's subjective symptoms were progressive and rated as severe (T. 466 of 564). Dr. Perelstein gave plaintiff an injection into her plantar fascia (T. 470 of 564). On March 7, 2013, plaintiff experienced no improvement due to the injection (T. 472 of 564). Dr. Perelstein determined that he would send plaintiff for a nerve conduction study ("EMG") and if that came back negative, he would propose a surgical endoscopic plantar fasciotomy (T. 472 of 564).

On March 21, 2013, plaintiff was seen by NP Molina (T. 502 of 564). Plaintiff reported that her anxiety had increased, that she was not sleeping and she was experiencing more panic attacks. Id.  NP Molina noted that on that date plaintiff appeared disheveled, anxious, and depressed (T. 504 of 564).

On March 22, 2013, Dr. Perelstein gave plaintiff another plantar injection (T. 474 of 564). He stated that he "could feel with the needle that the spur is very long and prominent in the area of the plantar heel". Id.  He renewed plaintiff's prescription for Lortab to deal with the pain. Id.  An EMG study conducted on March 25, 2013 did not reveal any abnormality (T. 461 of 564).

Plaintiff saw Dr. Perelstein again on March 30, 2013 (T. 475 of 564). He took an x-ray of plaintiff's heel which reflected a moderate spur which was "plantarly oriented" (T. 476 of 564). He offered to give her another injection, but plaintiff stated that the Lortabs worked better than the injections which also appeared to aggravate her gastric issue. Id.  On April 19, 2013, Dr. Kodial noted that plaintiff's pain was relieved by medication (T. 344 of 564).

In a report dated April 20, 2013, Dr. Perelstein stated that plaintiff's insurance would not cover the injection therapy (T. 477 of 564). Plaintiff stated that she was interested in having the surgery performed and provided Dr. Perelstein with possible dates. Id. At plaintiff's request, Dr. Perelstein agreed to increase the dosage of her prescription for Lortabs (T. 478 of 564).  On April 25, 2013, Dr. Kodial noted that the symptoms of plaintiff's plantar condition were not improving despite injections, and that plaintiff was going to have surgery (T. 520 of 564).

On May 30, 2013, plaintiff advised NP Molina that she was sad (T. 505 of 564). On that date, NP Molina reported that while plaintiff was adequately dressed, she was apathetic and depressed; her affect was constricted; and she exhibited a poverty of speech which was slow in rate and low in tone (T. 506 of 564).

Plaintiff had a therapy session with Ms. Jankowski on June 3, 2013 (T. 554). Ms. Jankowski reported that plaintiff had a depressed affect and reported feeling depression. Id. Plaintiff also reported that she had a "hard time leaving the house or talking on the phone". Id. Although she will go out to visit friends, she reported low motivation and daily sadness, but her sleep had improved. Id. Ms. Jankowski noted that plaintiff was to have surgery on her foot on August 2, 2013. Id.

During a therapy session on June 17, 2013, Ms. Jankowski stated that plaintiff had a depressed affect and was tearful at times (T. 556 of 564). Plaintiff reported an increase in her depression and anxiety. Id. She stated that she did not want to leave the house and felt anxious most days. Id. She also stated that she feels angry all the time and that she cleans when she is angry. Id.  Ms. Jankowski stated that plaintiff has made "minimal progress". Id.

On July 1, 2013, Ms. Jankowski reported that plaintiff had a depressed affect and "did not smile and looked [at] the floor" (T. 558 of 564). Plaintiff reported that she had been feeling more depressed and became easily confused (T. 558 of 564). According to Ms. Jankowski, plaintiff also

reported that she was struggling to manage her "ADL's" [activities of daily living] and that her older daughter has been taking care of her when she needs help. Id.

Ms. Jankowski prepared a mental residual functional capacity evaluation of plaintiff on July 8, 2013 (T. 480-84 of 564).  She stated that plaintiff had made minimal progress in treatment due to ongoing symptoms of depression and anxiety (T. 480 0f 564). Ms. Jankowski stated that plaintiff suffered from a pervasive loss of interest in almost all activities, sleep disturbance, appetite disturbance with weight change, decreased energy and feelings of guilt or worthlessness (T. 481 of 564). She also noted that plaintiff had generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating and psychomotor agitation or retardation. Id.  In addition, plaintiff exhibited paranoid thinking or inappropriate suspiciousness, recurrent obsessions or compulsions, hyperactivity, and emotional withdrawal or isolation. Ms. Jankowski opined that plaintiff had intense and unstable interpersonal relationships and impulsive and damaging behavior, perceptual or thinking disturbances, hallucinations or delusions, and was easily distracted. Id. Finally, she noted that plaintiff suffered from recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. Id.

Ms. Jankowski opined that plaintiff was "seriously limited" in her ability to sustain an ordinary routine without special supervision or to work in coordination or proximity with others without being unduly distracted (T. 482 of 564). She also found plaintiff to be "seriously limited" in her ability to accept instructions, respond appropriately to criticism, get along with co-workers, or respond to changes in a routine or work setting. Id.

According to Ms. Jankowski, plaintiff would be unable to meet competitive standards with respect to making simple work-related decisions, dealing with normal work stress, or taking appropriate precautions with respect to normal hazards. Id. With respect to the ability to complete a

normal workday and workweek without interruptions from psychologically based symptoms, Ms. Jankowski opined that plaintiff would have "no useful ability to function". Id.

On August 1, 2013, NP Molina stated that although plaintiff's sleep was somewhat improved, plaintiff remained sad (T. 549 of 564). Her mood was apathetic and depressed, her affect was constricted, and her speech was slow and with a low tone (T. 550 of 564).

On August 7, 2013, Ms. Jankowski noted that plaintiff appeared depressed and was tearful during the therapy session (T. 561 of 564). She was upset with her husband who had moved back to Iran. Id. Plaintiff reported that she was calmer, but continued to have anxiety and panic attacks. Id. She stated that going to a mosque daily to pray helped her. Id.

In a status report dated August 22, 2013, Ms. Jankowski stated that plaintiff has been diagnosed with "Bipolar II, Depressive Disorder" (T. 553 of 564). She stated that plaintiff's mental health symptoms impaired her overall functioning. Id. Finally, Ms. Jankowski reported that although plaintiff has been compliant with treatment, she has made minimal progress due to the severity of her symptoms. Id.

On August 30, 2013, Ms. Jankowski reported that plaintiff's mood was euthymic and stable, but that she continued to have panic attacks mostly at night (T. 563 of 564). She reported that plaintiff continues to have recurring dreams that a man is after her even though nothing like that has happened to her in real life. Id

## ANALYSIS

### A. Standard Of Review

Plaintiff argues that the Acting Commissioner erred in finding that she was not disabled. The only issue I must determine is whether the Acting Commissioner's decision is supported by

substantial evidence.  See 42 U.S.C. §405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).  The

Social Security Act states that, upon review of the Acting Commissioner's decision by the district court,

"[t]he findings of the Acting Commissioner . . . as to any fact, if supported by substantial evidence, shall

be conclusive".  42 U.S.C. §405(g). Substantial evidence is that which a "reasonable mind might accept

as adequate to support a conclusion". Consolidated Edison Company of New York. Inc. v. National

Labor Relations Board, 305 U.S. 197, 229 (1938).

For purposes of entitlement to disability insurance benefits, a person is considered

disabled when he or she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months".  42 U.S.C.

§§423(d)(1)(A) & 1382c(a)(3)(A). Such a disability will be found to exist only if an individual's

"physical or mental impairment or impairments are of such severity that [he or she] is not only unable to

do [his or her] previous work but cannot, considering [his or her] age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42

U.S.C. §§423(d)(2)(A) & 1382c(a)(3)(B).

In order to determine whether plaintiff is suffering from a disability, the Acting

Commissioner must employ a five-step inquiry:

> 1. The Acting Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Acting Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a 'severe impairment,' the Acting Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Acting Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not 'listed' in the regulations, the Acting Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Acting Commissioner then determines whether there is other work which the claimant could perform.

The Acting Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. Talavera v. Astrue, 697 F.3d 145, 151 (2nd Cir. 2012); *see also* 20 C.F.R. §§404.1520, 416.920.  However, the ALJ has an affirmative duty to fully develop the record where deficiencies exist. Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972); Swiantek v. Acting Commissioner of Social Security, 588 Fed.Appx. 82, 84 (2nd Cir. 2015).

If a claimant has a mental impairment, the ALJ must employ the "special technique" identified in 20 C.F.R. §404.1520a to evaluate the claimant's symptoms and rate the degree of functional limitation resulting from the impairment. 20 C.F.R. §404.1520a(b). In doing so, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the symptoms, and how a claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. §404.1520a(c).  The ALJ must rate a claimant's degree of limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3).[11]

With respect to assessing limitations in the first three functional areas, a five point scale is used: none, mild, moderate, marked, and extreme. In the fourth functional area, a four point scale is used: none, one or two, three, four or more. 20 C.F.R. §404.1520a(c)(4).  To satisfy the Paragraph B criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in

---

[11]    These functional areas are also listed in §12.04B of the Appendix 1 listings and are referred to as the "Paragraph B criteria."

maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

A "marked" limitation means "more than moderate, but less than extreme"; one that "interferes seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C). "Repeated" episodes of decompensation means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks" or "more frequent episodes of shorter duration or less frequent episodes of longer duration" which are determined, in an exercise of judgment, to be "of equal severity". Id., §12.00(C)(4). See also Roach v. Colvin, 2013 WL 5464748, *8 (N.D.N.Y.  2013).

Where the ALJ determines that the claimant has a severe mental impairment, the ALJ must determine whether that impairment meets or equals a mental disorder listed in Appendix 1. 20 C.F.R. §404.1520a(d)(2). Mental impairments are addressed at §12.01 et seq. of the Appendix 1 listings. If the mental impairment is severe but does not meet or equal the Appendix 1 listing, the ALJ must consider any limitations resulting from the impairment when making a residual functional capacity assessment. 20 C.F.R. §404.1520a(d)(3).  When the plaintiff's impairment is a mental one, special "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work."  See Social Security Ruling 82-62 (1982); Farrill v. Astrue, 486 Fed. App'x 711, 712 (10th Cir. 2012).

## B.  ALJ McGuan's Residual Functional Capacity Assessment

ALJ McGuan found that plaintiff suffered from the following severe impairments: Achilles tendinosis, plantar fasciitis, joint synovitis, plantar spur and bipolar disorder (T. 25 of 564).

Nevertheless, he determined that plaintiff has the residual functional capacity to perform light work except that she must be allowed to alternate between sitting and standing/walking after 30 minutes; can only occasionally understand, remember and carry out complex and detailed instructions; and can only occasionally interact with the public (T. 27 of 564).

       Plaintiff argues that ALJ McGuan's residual functional capacity assessment is not supported by substantial evidence. Plaintiff's Memorandum of Law [8-1], p. 15. She asserts that ALJ McGuan erred by giving significant weight to the consulting opinions of Dr. Santarpia and Dr. Juan Echevarria, and giving little weight to the assessment of Ms. Jankowski, plaintiff's treating counselor. Id.

       In making his residual functional capacity assessment, ALJ McGuan stated that he placed significant weight upon the opinions of Dr. Santarpia (T. 29 of 564) and Dr. Echevarria (T. 30 of 564). Although he briefly noted some of NP Molina's findings, he did not state what, if any, weight he would assign to them. Id.  ALJ McGuan stated that he gave little weight to the findings and opinions of Ms. Jankowski (T. 31 of 564).

       ALJ McGuan's reliance upon Dr. Santarpia's opinion does not establish substantial evidence to support his residual functional capacity assessment. Initially, it should be noted that plaintiff was examined by Dr. Santarpia on April, 30, 2012 (T. 289 of 564) more than a year prior to the hearing and almost 19 months prior to ALJ McGuan's decision. Dr. Santarpia's report does not reflect what, if any, records she reviewed relating to plaintiff's prior mental health treatment from Horizon Health Services or others. Of course, Dr. Santarpia did not have access to the records regarding plaintiff's treatment subsequent to April 30, 2012.

       In any event, it does not appear that Dr. Santarpia had a complete understanding of the nature of plaintiff's symptoms. For example, although the record indicates that plaintiff experienced

panic attacks, some as recently as a month prior to her examination by Dr. Santarpia (i.e. T. 488 of 564), the consultative report by Dr. Santarpia states that no panic attacks were reported (T. 290 of 564).[12]

Moreover, Dr. Santarpia's own findings appear to contradict her conclusory opinion upon which ALJ McGuan relied.  As noted above, upon examination Dr. Santarpia found that plaintiff's affect was dysphoric, her mood was dysthymic, her ability to concentrate was mildly impaired, and her recent and remote memory were impaired (without qualification) (T. 290-91 of 564). Dr. Santarpia concluded that her evaluation of plaintiff was "consistent with psychiatric problems and may *acutely* interfere with the claimant's ability to function on a daily basis". Id. (emphasis added). These findings do not support Dr. Santarpia's opinion that plaintiff could, among other things, maintain attention and concentration, maintain a regular schedule, learn new tasks, and appropriately deal with stress within normal limits. Id.

Dr. Echevarria's opinion also fails to establish substantial evidence to support ALJ McGuan's assessment. As an initial matter, the opinion of a non-examining physician is of particularly limited value in assessing the impact of a mental impairment on an individual's functional capacity. "Mental impairments specifically are diagnosed with the benefit of a doctor's observation of signs of a patient's mental health not rendered obvious by the patient's subjective reports, in part because the patient's self-reported history is 'biased by their understanding, experiences, intellect and personality' . . . , and in part because it is not uncommon for a person suffering from a mental illness to be unaware that his 'condition reflects a potentially serious mental illness'". Blevins v. Colvin, 2013 WL 1192403, *5 (W.D. Wash. 2013).

Indeed, Judge Telesca has found that "it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the

---

[12]   It is not clear whether Dr. Santarpia asked plaintiff if she experienced panic attacks, to which plaintiff responded negatively, or whether plaintiff merely failed to list panic attacks among her complaints when asked generally for her symptoms. However, this does suggest that Dr. Santarpia either did not have all of the relevant records relating to plaintiff's condition, or that she did not adequately account for all of the symptoms related in those records.

physician rendering the diagnosis to personally observe the patient." Ransome v. Colvin, 2016 WL 768658, *3 (W.D.N.Y. 2016) (citations omitted). Thus, "the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little, if any, weight." Id.

Plaintiff argues that Dr. Echevarria merely used a form and failed to provide any explanation of his opinion that plaintiff retained the capacity to perform simple, low contact tasks. Plaintiff Memorandum of Law [8-1], pp. 17-18. The Acting Commissioner asserts that Dr. Echevarria did explain his opinion in section III of the form. Acting Commissioner's Memorandum of Law [12-1], pp. 20-21.

Dr. Echevarria's explanation in section III of the form (T. 313 of 564), however, is almost entirely based upon the findings and conclusions of Dr. Santarpia's consultative examination. Id. As such, Dr. Echevarria's opinion is subject to the same infirmities as that provided by Dr. Santarpia.

Plaintiff argues that ALJ McGuan also erred by discounting the findings and opinions of Ms. Jankowski. Plaintiff's Memorandum of Law [8-1], p. 20. The Acting Commissioner asserts that ALJ McGuan was not required to give weight to Ms. Jankowski's opinion because she is not an acceptable medical source. Acting Commissioner's Memorandum of Law [12-1], p. 22.

Licensed clinical social workers, such as Ms. Jankowski, are medical sources who do not fall within the Acting Commissioner's list of acceptable medical sources. See 20 C.F.R. § 404.1513(d) and § 416.913; SSR 06–03p. While a licensed clinical social worker's opinion is not entitled to controlling weight, under Social Security Ruling (SSR) 06–03p, the opinions of non-acceptable medical sources, who often have "close contact with . . . individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time," are to be considered as "valuable sources of evidence for assessing impairment severity and functioning." SSR 06–03p. Additionally, the regulations stated that depending on the facts of a

particular case, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an acceptable medical source, including the medical opinion of a treating source." Id.

      While ALJ McGuan was not required to give Ms. Jankowski's findings and opinions controlling weight, the record reflects that her findings are consistent with the reports by NP Molina, with whom she worked, and the record as a whole. ALJ McGuan discounted Ms. Jankowski's opinion, in part, because the "objective mental status examinations" indicate that plaintiff's "ability to concentrate and memory are good" (T. 31 of 564).  However, such a rationale is undermined by the findings of Dr. Santarpia, upon whom ALJ McGuan relied, who found that plaintiff's concentration was mildly impaired and her memory, both recent and remote, was impaired (T. 291 of 564). Other reports in the record also indicate that plaintiff suffered from concentration issues (i.e. T. 253 of 564).

      Further, in discounting Ms. Jankowski's findings, ALJ McGuan cherry-picked findings from selected reports which reflected some improvement in plaintiff's symptoms, which may have been temporary in nature. The plaintiff was diagnosed as suffering from bipolar disorder,[13] which ALJ McGuan found to be a severe impairment (T. 25 of 564). It is not uncommon that plaintiff would experience swings in mood in light of this diagnosis. Norman v. Apfel, 1998 WL 34112755, *1 (N.D. Iowa 1998) (Bipolar disorder, also known as manic depressive illness, is generally characterized by

---

[13]   In Pounds v. Astrue, 772 F. Supp. 2d 713, 717 (W.D. Pa. 2011), bipolar disorder was characterized as "a mental condition resulting from disturbances in the areas of the brain that regulate mood. It is characterized by periods of excitability (mania) alternating with periods of depression. During manic periods, a person with bipolar disorder may be overly impulsive and energetic, with an exaggerated sense of self. The depressed phase brings overwhelming feelings of anxiety, low self-worth, and suicidal thoughts. The mood swings between mania and depression can be very abrupt, or manic and depressive symptoms may occur simultaneously or in quick succession in what is called a mixed state. There is a high risk of suicide with bipolar disorder and it is often accompanied with alcohol or other substance abuse. The condition is treated with mood-stabilizing medications such as Depakote (valproic acid) or Lamictal (lamotrigine)."

symptoms that include mood swings, an increased sense of energy, urgency to speak, and impulsive behavior).

For these reasons, I find that ALJ McGuan's residual functional capacity assessment, which is primarily based upon the opinions of Dr. Santarpia and Dr. Echevarria, is not supported by substantial evidence. This case is remanded to the Acting Commissioner for further proceedings consistent with the above.

## C.  Need for Medical Opinion Regarding Heel Pain

Plaintiff also argues that ALJ McGuan should have obtained a medical opinion regarding the functional limitations resulting from plaintiff's foot and heel problems. Plaintiff's Memorandum of Law [8-1], p. 22.  The Acting Commissioner asserts that ALJ McGuan adequately developed the record. Acting Commissioner's Memorandum of Law [12-1], p. 24.

The record reflects that plaintiff was experiencing heel pain, which she described as severe (T. 454 of 564). Dr. Perelstein recommended surgery which was supposed to take place in August 2013 (T. 554 of 564). At the time of the hearing, the surgery had not yet taken place (T. 39 of 564). While the record reflects that Lortabs provided some relief with respect to plaintiff's heel pain, it does not appear that this presented a long-term solution for plaintiff's condition (T. 478 and 520 of 564).

When initially discussing plaintiff's foot pain, ALJ McGuan referred to the findings of Dr. Samuel Balderman, a consulting internist who examined plaintiff on April 30, 2012 (T. 293 of 564). Although ALJ McGuan set forth the detailed findings of Dr. Balderman as to plaintiff's gait and ability to ambulate (T. 28 of 564), he eventually acknowledged that Dr. Balderman's examination predated the onset of plaintiff's foot problem (T. 29 of 564). Thus, Dr. Balderman's findings are of no help in assessing the extent to which plaintiff's foot pain impacts her functional capacity.

Plaintiff testified that because of her foot pain, she could only walk about 10 to 15 minutes, and could only stand about 10 minutes (T. 57 of 564). ALJ McGuan discounted this testimony because plaintiff testified that when she gets a panic attack, she "walks and walks and walks" (T. 32 of 564).  It is not clear that plaintiff's statement that she walks when she gets a panic attack, contradicts her testimony as to the limitations of how long she can walk or stand.

In any event, since this case is remanded to the Acting Commissioner for further proceedings regarding plaintiff's residual functional capacity relating to her psychological disorder, the Acting Commissioner should also more fully develop the record to determine whether plaintiff's capacity to stand and walk is limited by the pain in her foot.  Unless the record, as developed, otherwise clearly establishes the extent of such limitations, it would appear that a medical opinion regarding the limitations imposed by plaintiff's foot condition would assist the Acting Commissioner in making such a determination.

## CONCLUSION

For these reasons, plaintiff's motion for judgment on the pleadings is granted to the extent that this matter is remanded to the Acting Commissioner for further proceedings consistent with the above. The defendant's motion for judgment on the pleadings is denied.

So Ordered.

Dated: September 21, 2016

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge